IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CYNTHIA ANN WATSON,              )
                                )
              Plaintiff,         )
                                )
       v.                       )        C.A. No. 18-880 (MN)
                                )
ANDREW SAUL[1], Commissioner of Social  )
Security,                       )
                                )
              Defendant.        )

## MEMORANDUM OPINION

Angela Pinto Ross, DOROSHOW, PASQUALE, KRAWITZ & BHAYA, Wilmington, DE – attorneys for Plaintiff

Heather Benderson, Special Assistant United States Attorney, SOCIAL SECURITY ADMINISTRATION, Office of the General Counsel, Philadelphia, PA – attorneys for Defendant.

May 26, 2020
Wilmington, Delaware

---

[1]      Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* section 205(g) of the Social Security Act, 42 USC 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

NOREIKA, U.S. DISTRICT JUDGE:

# I.    INTRODUCTION

Plaintiff Cynthia Ann Watson ("Ms. Watson" or "Plaintiff") appeals the decision of Defendant Andrew Saul, the Commissioner of Social Security ("the Commissioner" or "Defendant"), denying her claim for Social Security Disability Insurance benefits under Title II of the Social Security Act.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are Plaintiff's motion and Defendant's cross-motion for summary judgment.  (D.I. 10, 12).  Plaintiff requests "that the Court conclude this litigation and exercise its authority to direct an award" or, alternatively, to "remand this case to the Commissioner with instructions to (1) properly consider all of the evidence including the opinions of treating and non-treating physicians []; (2) properly consider all of Ms. Watson's severe impairments; (3) properly consider the credibly established limitations; [(]4) reassess her residual functional capacity; (5) obtain new vocational testimony and pose a complete question to the VE; and (6) issue a new decision based on substantial evidence and proper legal standards."  (D.I. 11 at 20).  The Commissioner requests that the Court affirm the decision denying Plaintiff's claim for benefits.  (D.I. 13 at 15).  For the reasons stated below, the Court will grant-in-part and deny-in-part Plaintiff's motion and deny Defendant's cross-motion for summary judgment.  This matter will be remanded for further proceedings.

# II.    BACKGROUND

## A.    Procedural History

On September 3, 2014 and October 6, 2014, Plaintiff filed applications for Disability Insurance Benefits under Title II, alleging disability beginning May 31, 2012.  (Tr. 212-216, 217-

220).[2]  Plaintiff's claim was denied initially on November 5, 2014 and again upon reconsideration on June 2, 2015.  (Tr. 94, 109).  Plaintiff then requested a hearing before the Administrative Law Judge ("ALJ") on June 10, 2015.  (Tr. 126-127).  The hearing took place on February 24, 2017 during which both Plaintiff and Christina L Beatty-Cody ("Ms. Beatty-Cody"), an impartial vocational expert ("VE") testified.  (Tr. 30-52).  After the hearing, on May 3, 2017, the ALJ issued a decision finding that Plaintiff "has not been under a disability within the meaning of the Social Security Act."  (Tr. 17).  Plaintiff requested review of the ALJ decision by the Appeals Council on June 23, 2017.  (Tr. 209-211).  On April 11, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-8).

On June 14, 2018, Plaintiff filed suit in the District of Delaware seeking judicial review of the Commissioner's denial of benefits.  (D.I. 1).  The parties completed briefing on the cross motions for summary judgment on March 6, 2019.  (D.I. 10-14).

**B.     Factual History**

Plaintiff applied for disability insurance benefits on September 3, 2014 and October 6, 2014 when she was 48 years old.  (Tr. 212-216, 217-220).  Plaintiff asserts that she became disabled as of May 31, 2012.  (Tr. 212).  Plaintiff received a GED and went to nursing school where she earned her license as a practical nurse.  (Tr. 46).  She worked as a practical nurse for 22 years.  (Tr. 46).

**1.     Disability Report – October 6, 2014 (Form SSA-3368)**

In her Disability Report dated October 6, 2014 (Form SSA-3368) (Tr. 243-253), Plaintiff asserted that she has the following physical or mental conditions that limit her ability to work:

---

[2]     References to "Tr." are to the "Transcript of Social Security Proceedings" filed on September 17, 2018.  (D.I. 5).

herniated disc, lumber spine impairment, severe back pain, asthma, complex regional pain syndrome, anxiety, depression, post-traumatic stress disorder, hypothyroidism. (Tr. 244).

In her disability report, Plaintiff indicates that she worked as a licensed practical nurse since January 1994. (Tr. 246). She also lists the following medications: "Ambieb"[3] (depression), Celexa, Klonopin, all prescribed by Dr. Stanley, Hydromorphone, MS Contin, Oxycontin, and Topamax, all prescribed by Dr. Falco. (Tr. 247). In addition to Dr. Stanley and Dr. Falco, Plaintiff lists Dr. Caswell-Wade, Dr. Duggan, Dr. Manifold, and A Center for Mental Wellness as providers who may have medical records about her physical and mental conditions. (Tr. 248-251).

### 2.    Disability Report – Appeal – June 11, 2015 (Form SSA-3441)

In her Appeal Disability Report (Tr. 293-301), Plaintiff indicates that there have been no new illnesses, injuries, or conditions (and no changes) and that there are no new physical or mental limitations because of her illnesses, injuries, or conditions. (Tr. 294). Her providers are Dr. Caswell-Wade, Dr. Duggan, Dr. Falco, and Dr. Stanley and the one medication listed is "Ambieb" prescribed by Dr. Stanley for depression. (Tr. 294-98).

### 2.    Medical History, Treatment, and Conditions

The Court has reviewed all medical records submitted. (D.I. 5-9 – 5-24, Exs. 1F – 35F).

### A.    Frank Falco, M.D. – Mid-Atlantic Spine and Pain Physicians

On April 14, 2013, Plaintiff presented at Dr. Falco's office for a new patient consultation/evaluation (Tr. 1243–1249) with chronic left hip, knee, leg, and foot pain. Plaintiff saw Dr. Falco or one of his associates at least once a month through 2016. (Tr. 647-763, 942-946, 1085-1133, 1234-1281).

---

[3]    This is appears to be a reference to Ambien. (*See e.g.*, Tr. 512).

During 2013, Dr. Falco treated Plaintiff with nerve blocks (Tr. 1237-1239), an epidural injection (Tr. 1236), an IT pump trial (Tr. 1235), a spinal cord stimulator trial (Tr. 1276-1277), a thoracic/lumbar brace (Tr. 1265-1266), and a spinal cord stimulator implant (Tr. 1263-1264).  In 2014, along with several follow-up visits, Plaintiff had a pump trial adjustment (Tr. 647-650, 732-736) and a CT scan of her lumbar spine which showed "stable degenerative changes" and "possible impingement of the existing left L4 nerve root" (Tr. 689).  In 2015, Plaintiff had a left shoulder arthrogram with post-procedure x-rays being unremarkable for a labral or rotator cuff tear (Tr. 719-720, 754), an ultrasound of her abdomen which suggested hepatic steatosis (Tr. 762-763), an abdomen obstruction series with no evidence of bowel obstruction (Tr. 753), a pain pump assessment (Tr. 755-758), and nerve blocks (Tr. 880-881, 887-888).

In August of 2015, Dr. Falco completed a Reflex Sympathetic Dystrophy (RSD)/Complex Regional Pain Syndrome Type 1 (CRPS) Medical Source Statement (Tr. 943-946) wherein he estimates that in an 8-hour workday, Plaintiff stand/walk for less than 2 hours and sit for about 4 hours, needs to walk around every 45 minutes for 5 minutes, needs to take unscheduled breaks every hour for 15 minutes, will be off task 25% or more of the time, and will miss more than four days per month.  Additionally, Plaintiff is to rarely lift and carry less than ten pounds and should never lift or carry anything heavier than ten pounds and should never twist, stoop, crouch/squat.  Dr. Falco also indicates that Plaintiff is capable of using her hands to grasp, turn or twist objects, using her fingers for fine manipulations, and can reach her arms in front of her body and over her head 100% of the time.  She can also tolerate low stress work and will have good and bad days.

### B.     Dr. Duggan – Christiana Care Middletown Center

The transcript contains records for Dr. Duggan, Plaintiff's primary care physician, starting in October 2012 and continuing into 2016.  (Tr. 509-527, 572-607, 764-800, 1005-1016).  Plaintiff

saw Dr. Duggan twice in 2012 with the chief complaint of leg pain (Tr. 520-527); three times in 2013 with chief complaints of back pain, hand injury, and edema (Tr. 509-519); multiple times in 2014 (Tr. 574-601, 792-800); six times in 2015 (Tr. 764-791); and twice in 2016 for swollen lymph nodes and for a pre-op clearance (Tr. 1006-1016).  In March and April 2014, Dr. Duggan ordered chest x-rays that showed pneumonia (Tr. 602) and no acute pulmonary disease (Tr. 597), respectively.  Also in 2014, Dr. Duggan inserted and removed both a PICC line and a venous catheter (Tr. 594-596, 581), and preformed two pre-op exams (Tr. 574-578; 792-800).  In 2015, Plaintiff's chief complaints were stomach pain.  As a result, she underwent several diagnostic studies, including: on 3/27/2015 an ultrasound and abdomen obstruction series, which showed "[m]ildly coarsened and echogenic liver suggestive of hepatic steatosis" and no evidence of bowel obstruction (Tr. 773); on 4/9/2015 a CT Scan of abdomen and pelvis without contrast which showed "[n]o acute inflammatory changes" (Tr. 765-767)[4]; and on 4/24/2015 an EGD, which suggested "gastroparesis/delayed gastric emptying" (Tr. 764).

### C. Center for Mental Wellness / People's Place Counseling

According to the record, Plaintiff treated at the Center for Mental Wellness from August 2013 through March 2014 (Tr. 528-561) and at People's Place Counseling from August 2014 through January 2017 (Tr. 608-646; 801-826; 1027-1084).

The diagnosis for all of the Center for Mental Wellness visits is "Depressive Disorder Not Elsewhere Classified."  From August 2013 through November 2013, Plaintiff's "mood is improved since last session.  Pain has decreased."  (Tr. 530, 532, 535, 538, 541).  In late 2013 through

---

[4]     The April 9, 2015 and April 24, 2015 studies were ordered by and/or performed by Dr. Joseph F. Hacker of Gastroenterology Associates.  Dr. Duggan referred Plaintiff to Dr. Hacker for evaluation of abdominal pain.  (*See* Tr. 768-772; 981-991).  Dr. Hacker's diagnosis of Plaintiff is constipation which he suspects "is a combination of neurologic damage and her narcotics as the etiology."  (Tr. 981-983).

March 2014, Plaintiff's mood is "irritable" (Tr. 543) or "sad" (Tr. 545, 547, 549, 551, 554, 556) with assessments of "depression has decreased" (Tr. 543); coping but pain overwhelming (Tr. 545); distraught but able to see plan (Tr. 547); down and angry (Tr. 549); mood is down but a slight improvement since last session (Tr. 551); and mood improved by end of session (Tr. 556).

At Plaintiff's August 6, 2014 Integrated Assessment Evaluation at People's Place Counseling, she was diagnosed with agoraphobia with panic disorder and major depressive disorder. (Tr. 613-619). Between August of 2014 and January of 2017, Plaintiff attended regular family therapy and psychotherapy appointments. (Tr. 621-646; Tr. 801-826; Tr. 1028-1084). During that time she was diagnosed with generalized anxiety disorder, and post-traumatic stress disorder. (Tr. 632). During sessions, Ms. Watson was shaking and picking at her fingers; had crying spells, walked around due to pain; was easily agitated; had red and swollen lower legs; and intense stress (Tr. 620, 628, 631, 811, 815, 817, 824, 1074). She also exhibited anger, memory issues, and difficulty coping with pain. (Tr. 1028-1040). Notes of exams throughout indicate that Plaintiff continued to suffer from depression, anxiety and stress. (*E.g.,* Tr. 641, 643, 801, 802-806, 1032, 1041, 1052, 1066, 1069).

### D.      Dr. Yalamanchili (Delaware Neurosurgical Group, P.A.)

On June 13, 2013, Plaintiff presented at Dr. Yalamanchili's office at the request of Dr. Falco for a consultation which resulted in a final diagnoses of complex regional pain syndrome, left leg and femoral neuropathy. (Tr. 479-482). At the request of Dr. Falco, Plaintiff returned to see Dr. Yalamanchili in September 2014 to review surgical treatment strategies. (Tr. 973-976). Plaintiff had appointments with Shakara Smith, a physician's assistant at Delaware Neurosurgical Group, on March 2, 2015 after implantation of her abdominal morphine pump (Tr. 971-972), January 11, 2016 for a follow-up (Tr. 968-970), and February 29, 2016 after removal of her dorsal

column stimulator and neuroreceiver (Tr. 966-967).   On March 28, 2016, Plaintiff saw Dr. Yalamanchili for a neurosurgical reassessment.  (Tr. 963-965).  Dr. Yalamanchili performed surgery on Plaintiff on November 21, 2016 to remove her morphine pump.  (Tr. 1225-1227).

### E.    Stephen G. Manifold, M.D. (Orthopaedic Surgeon)

According to the transcript, Plaintiff saw Dr. Manifold or Brittany M. Dixon, P.A. two times in 2011 and seven times in 2012.  (Tr. 439-461).  Plaintiff's chief complaints were left knee pain and left wrist pain.[5]  At Plaintiff's November 2011 visits, the records note that an x-ray of the left knee showed no acute abnormalities and no significant degenerative changes (Tr. 441) and Plaintiff has not done any outpatient physical therapy and has not used any assistive devices (Tr. 443).  At the January 25, 2012 visit, the "[e]xamination of the left knee reveals – no swelling or edema, normal deep tendon reflexes and normal coordination, normal strength and tone, normal sensation and no known fractures or deformities.  (Tr. 446).  Plaintiff's last visit memorialized in the records is a visit in August 2012 at which her left knee examination revealed no swelling or edema, normal deep tendon reflexes and normal coordination, normal strength and tone, normal sensation and no known fractures or deformities.  (Tr. 456).  Physical therapy was recommended and Plaintiff agreed to proceed.[6]  (Tr. 456).

---

[5]    The Court does not address Plaintiff's left wrist injury as (1) it is not part of the disability claim (Tr. 244 & 294) and (2) she was released to return to work from this injury on August 17, 2012.  (Tr. 473).

[6]    The transcript contains physical therapy records for (1) Southern Delaware PT (July 11, 2012 through July 30, 2012) with all visits for Plaintiff's wrist (Tr. 367-383) and (2) Dynamic Physical Therapy (June 18, 2015 through July 30, 2015) (Tr. 947-961).  Of note, Tr. 383 is a prescription dated August 8, 2012 from Dr. Manifold for a "PT Evaluation" and "Therapeutic Exercises" for "complex regional pain syndrome of left lower extremity."  However, the transcript contains no records during this time frame for physical therapy.

### F.     Diagnostic Studies

Plaintiff had the following diagnostic studies[7]:

| Date/Type of Study | Findings |
|---|---|
| 12/29/2011<br>Nerve Conduction Study – left leg<br>Tr. 462-463 | Normal screening study |
| 01/09/2012<br>MRI Left Knee<br>Tr. 438 | 1.  Stable chondromalacia patella.<br><br>2.  Intact menisci-ligaments.<br><br>3.  Interval development of marrow changes involving the posterior aspect of both the medial and lateral femoral condyles from either bone infarcts or intact osteochondral lesions. Enchondromas are considered an unlikely etiology |
| 01/24/2013<br>Nerve Conduction Study/EMG with sedation<br>Tr. 476-478 | This is a normal study given the limitations of the study being done under anesthesia. |
| 05/21/2015<br>Upper Endoscopic Ultrasound<br>Tr. 1202-1204 | Mildly dilated bile duct without obstructing stone or mass.<br><br>Findings otherwise "normal," "unremarkable" or showed "no sign of significant pathology. |
| 06/04/2015<br>Gastric Emptying Scan<br>Tr. 1004 | Gastric emptying study using: a solid meal shows abnormally delayed gastric emptying of solids. As the patient is treated with chronic narcotic medications, this would be expected to delay gastric emptying |
| 08/04/2015<br>CT Scan of Lumbar Spine without Contrast<br>Tr. 1002-1003 | Location of the intrathecal pump catheter has changed slightly since previous CT of the abdomen and pelvis performed in April 2015, as detailed above. |

---

[7]     Plaintiff underwent diagnostic studies for wrist pain that are irrelevant to her disability claim.  (*See* Tr. 385-395; 469).

| Date/Type of Study | Findings |
|---|---|
| 08/04/2015<br>CT Scan of Thoracis Spine without Contrast<br>Tr. 1000-1001 | Since previous CT of the abdomen performed on 4/9/2015 the location of the intrathecal catheter has changed.  The previous study had shown a predominantly right ventrolateral location whereas the current exam demonstrates the catheter to be displaced along the left ventrolateral surface of the cord, please see above comments for additional details.<br><br>Intraspinal neural electrodes are present at T7-T12 levels, along the dorsal aspect of the thecal sac, as detailed above |
| 08/05/2015<br>CT Scan of Head without Contrast<br>Tr. 999 | No acute or focal intracranial abnormality. |
| 01/26/2016<br>X-ray of Abdomen<br>Tr. 998 | No evidence of bowel obstruction. |
| 03/11/2016<br>CT Scan of Lumbar Spine without Contrast<br>Tr. 996-997 | Interval removal of previously noted intraspinal electrode array. Redemonstration of partially imaged intrathecal pump catheter, slightly changed in position above the L2 level as compared to the prior study. See details above.<br><br>Stable degenerative change most prominent at L4-L5, where there is mild spinal canal narrowing and left greater than right neural foraminal stenosis, with crowding of the exiling left L4 nerve root. |
| 06/29/2016<br>X-ray of Abdomen/pelvis<br>Tr. 995 | Plain film abdomen and pelvis is unremarkable |
| 09/06/2016<br>CT Scan of Lumbar Spine without Contrast<br>Tr. 993-994 | Intrathecal catheter tip at the T9-T10 disc space level on the lateral scout topogram.<br><br>Stable degenerative changes as detailed above causing moderate left L4-5 and otherwise mild foraminal stenosis without definite nerve root compression. |

| Date/Type of Study | Findings |
|---|---|
| 01/27/2017<br>MRI Lumbar Spine<br>Tr. 1134-1136; 1229-1230 | Acceptable alignment.<br><br>Lumbar spondylosis with facet arthrosis.<br>Mild discogenic disease as above, similar to that noted on the prior exam.<br><br>Of note:<br>L4/5 level broad-based left lateralizing disc bulge/osteophytic ridge contributes to mild to moderate left foraminal narrowing with contact of the exiting left L4 nerve root. |

### G.    State Agency Consultants

In October and November 2014, state agency consultants Alex Siegel, Ph.D. and Darrin Campo, M.D., reviewed the evidence of record and determined that Plaintiff "is only able to do simple routine work."  (Tr. 92).  Dr. Campo opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of 2 hours and sit (with normal breaks) for about 6 hours in an 8-hour workday, and had limited capacity to push and/or pull in her left lower extremity.  (Tr. 87).  He opined that Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl and that she could never climb ladders/ropes/scaffolds and could occasionally balance (Tr. 88).  Dr. Campo limited Plaintiff to simple routine work.  (Tr. 92).  Dr. Siegel opined that Plaintiff does have understanding and memory limitations, sustained concentration and persistence limitations, social interaction limitations, and adaptation limitations with the highest limitation being "moderately." (Tr. 89-91).  Dr. Siegel opined that "claimant can perform simple, routine, repetitive tasks in a stable environment."  (Tr. 91).

In May 2015, Vinod K. Kataria, M.D. affirmed Dr. Campo's November 2, 2014 assessment as written (Tr. 103) and Carlene Tucker-Okine Ph.D. affirmed Dr. Siegel's assessment as written

(Tr. 104). In her analysis, Dr. Kataria reviews the April 24, 2014 Confidential Psychological Evaluation performed by Rachel Brandenberg, Psy.D. (Tr. 562-571)[8] and finds "[t]he opinion relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion[.]"; "[t]he opinion is without substantial support from other evidence of the record, which renders it less persuasive[.]"; and the "opinion is an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." (Tr. 105-106). Dr. Kataria goes on to further state that "claimant is only able to do simple routine work." (Tr. 106).

### H. Other Medical Providers

The transcript contains records from Southern Delaware Physical Therapy (Tr. 367-383), Dynamic Physical Therapy (Tr. 947-961), Dr. Donlin M. Long (Tr. 483-508), Christiana Care Emergency Department Visits/Op Reports (Tr. 1137-1223), Dr. Ginger Chang (Tr. 384-438), Dr. Allan J. Belzberg (Tr. 474-478), and Dr. Michael R. Lobis (Tr. 978-979). To the extent any of that care is relevant to the Court's analysis it will be discussed below.

### 3. The Administrative Hearing

On February 24, 2017, the ALJ conducted an administrative hearing, at which both Plaintiff and VE, Ms. Beatty-Cody, testified. (Tr. 36).

### A. Plaintiff's Testimony

Plaintiff testified that she stopped working in May of 2012 because the pain and swelling in her feet and legs had gotten so bad that she "just couldn't do it anymore . . . ." (Tr. 47). Plaintiff suffers from reflex sympathetic dystrophy ("RSD") that affects her hips, buttocks, both of her legs

---

[8]  Plaintiff was referred to Dr. Brandenburg "by the Disability Determinations Service to determine [the] level of functional problems for disability determination purposes." *See* Tr. 562 "Reason for Examination."

and feet with burning, stabbing pain, numbness and tingling. (Tr. 47). She further testified that both her "knees are shot" and that sometimes they give out on her while walking down stairs and she has actually fallen down steps multiple times. (Tr. 47-48). She suffers from "painful numbness" in her back, buttocks, and vagina and that the pain is constant. (Tr. 48). The constant pain causes her to not be able to stand, sit, or walk for long periods of time and that "[t]he only way it's really comfortable is to lay in bed but [she] constantly ha[s] to switch positions." (Tr. 48). On average Plaintiff sleeps about four interrupted hours per night and is constantly tired. (Tr. 48).

Plaintiff has had eight surgeries, has tried a stimulator and a pain pump. (Tr. 48-50). She takes oral medication, Morphine and Dilaudid. (Tr. 50).

In addition, Plaintiff has neuropathy in her legs that causes rashes on her legs, burning pain in her feet and legs, her toes to cramp, and Charlie horses in her legs. (Tr. 51). Because of her back issues, Plaintiff is unable to urinate and has to catheterize herself. (Tr. 52). She has also been diagnosed with gastroparesis. (Tr. 52).

Plaintiff suffers from depression and cries every day because she feels like "there's no light at the end of the tunnel" that she is "never going to get better" and she does not see "any reason to live anymore." (Tr. 54). She does not socialize anymore, has not gone to family functions in years, does not talk to anyone, go anywhere, or do anything and has been diagnosed with agoraphobia. (Tr. 54, 58). She does not belong to any church, social group, or club, does not read or use a computer, and has no hobbies. (Tr. 60). Plaintiff further testified that she has difficulty concentrating, completing tasks, and has mood issues. (Tr. 54-55).

As to her daily functioning, Plaintiff testified that she can walk for "maybe 50 feet", can stand for ten minutes, cannot sit for periods of time, she does not lift or carry things, cannot keep her arms above her head, has difficulty climbing stairs, has to elevate her legs a couple of times

throughout the day, cannot shave her legs, or put her shoes on if she has to bend over to do so. (Tr. 55-58, 61).  As to household chores, Plaintiff testified that she does some dishes, dusting, goes grocery shopping with her husband, sorts and folds laundry, does not do any outside chores, or pay bills.  (Tr. 59, 61).

### B.     Vocational Expert's Testimony

Ms. Beatty-Cody testified that Plaintiff's past work as a licensed practical nurse and a vocational teacher are jobs that are typically performed at the medium and light exertion levels, respectively.  (Tr. 70-71).  Based on Plaintiff's testimony, she performed these jobs at heavy exertion levels.  (Tr. 71).  The ALJ asked Ms. Beatty-Cody to consider a hypothetical person of the same age, with the same high school education, and with the same past work experience as Plaintiff and to assume that the individual could perform light work with limitations of only occasionally climbing ramps or stairs, balancing, stooping, kneeing, crouching, or crawling.  (Tr. 71).  On the other hand, this hypothetical individual could climb ladders, ropes, and scaffolds.  (Tr. 71).  When asked if this hypothetical person could perform any of Plaintiff's past work, Ms. Beatty-Cody testified that they could work as a vocational teacher.  (D.I. 71).  The ALJ then limited this hypothetical person to "only simple routine and repetitive tasks with only brief superficial interaction of the public and coworkers" and asked Ms. Beatty-Cody if this hypothetical person could perform any of Plaintiff's past work.  Ms. Beatty-Cody testified that they could not.  (Tr. 71).  When asked to identify other jobs the hypothetical person could perform, Ms. Beatty-Cody identified positions of a final inspector, tabber, and filler.  (Tr. 71-72).  With the added limitations of avoidance of "concentrated exposure to extreme cold or heat, wetness, humidity, vibration, respiratory irritants or hazards" and limited sit/stand and lift capabilities, Ms. Beatty-Cody testified that the final inspector, tabber, and filler positions would still be feasible.  (Tr. 73-74).  However,

if the lifting demand were lowered to a total of ten pounds and a regular pattern of absences occurred, that would eliminate these jobs.  (Tr. 74).

When questioned by Plaintiff's attorney, Ms. Beatty-Cody testified that work would be preclusive if the hypothetical person was required to take unscheduled 15 minute breaks every hour, would be off task 25% or more of the time, and would need to elevate their legs throughout the work day.  (Tr. 76-77).

**C.    The ALJ's Findings**

On May 3, 2017, the ALJ issued the following findings (Tr. 19-28):

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.    The claimant has not engaged in substantial gainful activity since May 31, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease; degenerative joint disease of the left knee; complex regional pain syndrome/reflex sympathetic dystrophy diagnosis; depression; anxiety; opioid dependence; personality disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can only occasionally climb ramps or stairs, balance stoop, kneel, crouch, or crawl. She can never climb ladders, ropes, or scaffolds. The claimant must avoid concentrated exposure to extreme cold or heat, wetness, humidity, vibrations, respiratory irritants, and hazards. She can perform simple, routine, repetitive tasks and have only brief, superficial contact with the public and coworkers.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was horn on November 18, 1965 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset

date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2012, through the date of this decision (20 CFR 404.1520(g)).

## III.   LEGAL STANDARDS

### A.   Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986).  A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).  If the moving party has carried

its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B.     Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). Evidence that was not submitted to the ALJ can be considered, however, by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has made clear that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (*e.g.*, that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the

17

case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV. **DISCUSSION**

### A. **Disability Determination Process**

Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the Social Security Income ("SSI") program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Zirnsak v. Colvin*, 777 F.3d 607, 611-612 (3d Cir. 2014). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity); *Zirnsak*,

777 F.3d at 611. If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *Id.* If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (20 C.F.R § 404.1520, Subpart P, Appendix 1) that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Zirnsak*, 777 F.3d at 611. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *Id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Zirnsak*, 777 F.3d at 611. A claimant's RFC "is the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1); *Zirnsak*, 777 F.3d at 611 (quoting 20 C.F.R. § 404.1545(a)(1)). "[T]he claimant always bears the burden of establishing (1) that she is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents her from performing her past work." *Zirnsak*, 777 F.3d at 611 (quoting *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983).

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of

nondisability when claimant can adjust to other work).  At this last step, ". . . the Commissioner bears the burden of establishing the existence of other available work that the claimant is capable of performing."  *Zirnsak*, 777 F.3d at 612 (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)).  In other words, the Commissioner ". . . is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [their] residual functional capacity and vocational factors."  20 C.F.R. § 404.1560(c)(2).  In making this determination, "the Commissioner uses the RFC assessment, . . . and the testimony of vocational experts and specialist."  *Zirnsak*, 777 F.3d 612.  "'Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy.'"  *Zirnsak*, 777 F.3d 612 (quoting *Provenzano v. Comm'r*, Civil No. 10-4460 (JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011)).

When mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis and an ALJ assesses mental impairments.  20 C.F.R. § 416.920a(a); *Hess*, 931 F.3d at 202.  As part of step two of the disability analysis, the ALJ decides whether the claimant has any "medically determinable mental impairment(s)."  20 C.F.R. § 416.920a(b)(1); *see also* 20 C.F.R. § 416.920(a)(4)(ii) (providing that, at step two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment"); *Hess*, 931 F.3d at 202.  "[A]s part of that same step and also step three of the disability analysis, the ALJ determines 'the degree of functional limitation resulting from the impairment(s)[.]'"  *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §416.920a(b)(2) and citing 20 C.F.R. §§ 416.920a(d), 416.920(a)(4)(ii)-(iii) (explaining that the ALJ uses "the degree of functional limitation" in assessing "the severity of [the claimant's] mental impairment(s)[,]" which is considered at steps two and three)).

In determining the degree of functional limitation, the ALJ considers "four broad functional areas . . .: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. § 416.920a(c)(3); *Hess*, 931 F.3d at 202.  The first three areas are rated on a "five-point scale: None, mild, moderate, marked, and extreme."  20 C.F.R. § 416.920a(c)(4); *Hess*, 931 F.3d at 202.  The fourth is rated on a scale of: "None, one or two, three, four or more."  *Id.*

"The ALJ uses that degree rating in 'determin[ing] the severity of [the] mental impairment(s)[,]' which is considered at steps two and three.  *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. § 416.920a(d) and citing 20 C.F.R. § 416.920(a)(4)(ii)-(iii) (stating that, at steps two and three, the ALJ "consider[s] the medical severity of [the claimant's] impairment(s)").  "If . . . the degree of [the claimant's] limitation in the first three functional areas [is] 'none' or 'mild' and 'none' in the fourth area, [the ALJ] will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in her ability to do basic work activities."  *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. 416.920a(d)(1) (citation omitted)).

"At step three, if the ALJ has found that a mental impairment is severe, he "then determine[s] if it meets or is equivalent in severity to a listed mental disorder." *Hess*, 931 F.3d at 202  (quoting  20  C.F.R.  §§  404.1520a(d)(2),  416.920a(d)(2)  and  citing  20  C.F.R.  §§ 404.1520a(a)(4)(iii), 416.920a(a)(4)(iii) (explaining that, at step three, the ALJ determines whether the claimant has "an impairment(s) that meets or equals" a listed impairment).  "That analysis is done 'by comparing the medical findings about [claimant's] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder.'"  *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2)).  As explained by the

Third Circuit, "the claimant may have the equivalent of a listed impairment if, *inter alia*, he has at least two of '1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1).

"[T]o complete steps four and five of the disability analysis, if the ALJ has found that the claimant does not have a listed impairment or its equivalent, the ALJ 'will then assess [the claimant's mental RFC].'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3) and citing 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v) (providing that, at steps four and five, the ALJ considers the claimant's RFC)).

**B.     Issues Raised on Appeal**

On appeal, Plaintiff raises two arguments in support of reversal for an award of benefits or remand:  (1) the ALJ failed to consider all of Plaintiff's credibly established limitations and (2) the ALJ erred in failing to afford adequate weight to Dr. Falco, Plaintiff's treating physician.  (D.I. 11).

**1.     Failure to Incorporate Credibly Established Limitations**

Plaintiff argues that, "[i]n making his RFC determination, the ALJ failed to include all of Ms. Watson's credibly established limitations both physical and mental" and the hypothetical questions presented to Ms. Beatty-Cody "failed to include all credibly established limitations." (D.I. 11 at 12).  The hypothetical question posed by the ALJ to the VE must accurately portray the claimant's individual physical and mental impairments.  *Podedworney v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).  It must include all of the claimant's "credibly established limitations." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  A hypothetical question, however, need reflect only those impairments that are credibly established by the record.  *Chrupcala v. Heckler*,

829 F.2d 1269, 1276 (3d Cir. 1987). A limitation supported by medical evidence, and "otherwise uncontroverted in the record," must be included in the hypothetical. *Zirnsak*, 777 F.3d at 614. "However, where a limitation is supported by medical evidence, but is opposed by other evidence in the record, the ALJ has discretion to choose whether to include that limitation in the hypothetical." *Id.* The ALJ was not required to include limitations that exceeded those the ALJ found supported by the record.

Here, Plaintiff asserts the following errors: "(1) the ALJ included limitations in his RFC that were not presented to the VE; (2) the ALJ failed to include in his RFC mental limitations that he determined credible; (3) the ALJ failed to include well-supported limitations in the record; and (4) despite affording significant weight, the ALJ failed to include in his RFC determination all of the limitations determined by the state agency consultants or provide an explanation for the rejection."

### a.    Limitations in the RFC that were not presented to the VE.

The ALJ stated in his RFC finding that Ms. Watson was not able to climb ladders, ropes or scaffolds. (Tr. 21). The limitation presented to the VE in the hypothetical, however, asked whether she was capable of climbing ladders, ropes and scaffolds (Tr. 71) and thus did not include the same RFC finding that the ALJ made at step five. Defendant asserts that this was harmless error, referencing the Dictionary of Occupational Titles ("DOT"). The Court agrees. The occupations actually identified by the VE do not require climbing. *See* FINAL INSPECTOR, DOT No. 727.687-054, 1991 WL 679672 ("Climbing: Not Present – Activity or condition does not exist"); INSERTER, DOT No. 727.687-054, 1991 WL 1991 WL 681328 (same); FILLER, DOT 780.684-066, 1991 WL 680790 (same). As such, this error is harmless and is not a basis for remand. *Woznicki v. Colvin*, No. 14-1202, 2016 WL 2758265, at *4 (D. Del. May 12, 2016) (harmless error

to not address the climbing and crawling limitations in a treating physician's opinion, because the jobs identified did not require those activities).

### b.  Failure to include credible mental limitations.

The ALJ acknowledged and found that Ms. Watson had several severe mental impairments, including depression, anxiety and personality disorder.  (Tr. 19).  In addition, the ALJ completed a Psychiatric Review Technique ("PRT") and determined that she had moderate limitations interacting with others and concentrating, persisting or maintaining pace as well as mild limitations in understanding, remembering or applying information and adapting and managing herself. (Tr. 20).  Plaintiff asserts, however, that the ALJ did not include these limitations in his RFC or pose them to the VE.  The Court agrees.

Although, not establishing a bright line test, in *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004), the Third Circuit made clear that PRT findings play a role in the fact-specific inquiry of whether particular limitations are properly accounted for in the RFC.  *Ramirez*, 372 F.3d at 552, 555.  Here, the ALJ did not properly account for all of Plaintiff's mental impairments that were identified.  The ALJ limited Plaintiff to simple, routine, repetitive work, but did not address her moderate limitations in terms of concentration, persistence, or pace.  Nor did the ALJ's limitation of "brief and superficial contact with the public and coworkers" fully encompass Plaintiff's moderate limitations in interacting with others.

Additionally, the Court agrees with Plaintiff that the Agency's consultative psychologist, Dr. Brandenburg, found many limitations relating to basic work-related activities that should have been incorporated into the RFC, including that she had a global assessment of functioning (GAF)

of 45,[9] and severe impairments in the ability to function in these areas: 1. sustaining work performance and attendance in a normal work-setting, 2. coping with pressures of ordinary work; 3. constriction of interests; and 4. ability to perform routine tasks under ordinary supervision. (Tr. 565-570)  The ALJ discounted Dr. Brandenburg's assessment in part, stating that "the record supported greater ability to perform work without excessive supervision and to handle stressors of simple work."  (Tr. 25).[10]  But the Court agrees with Plaintiff that the ALJ's determination is not supported by the findings in the mental status examination.  Dr. Brandenburg's examination also revealed that Plaintiff was psychologically unstable suffering from severe depression and was emotionally labile, and tearful.  (Tr. 565).  This exam was consistent with Ms. Watson's therapy records over a period of years, which revealed repeated episodes of decompensation, crying spells, anxiety and depression.  All of Plaintiff's mental impairments should have been included in the ALJ's RFC, and the Court will remand for further findings on this issue.

### c.     Failure to include other well-supported limitations.

Plaintiff asserts that the ALJ disregarded Plaintiff's complaints of urinary and bowel disorders claiming that evidence show no abnormalities.  In support of that assertion, Plaintiff cites to a gastric emptying study and doctors statements that the condition was likely due to neurological and narcotic use, not abuse.  (D.I. 11 at 16).  The ALJ, however, did not disregard Plaintiff's complaints as to these issues.  The ALJ included a paragraph in his opinion addressing Plaintiff's

---

[9]     See Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev., 2000) (DSM-IV-TR) (stating that a GAF of 45 is consistent with major impairment in several areas including work)

[10]     The Court recognizes that another state consultant, Dr. Kataria, reviewed Dr. Brandenberg's report and found that "[t]he opinion is without substantial support from other evidence of the record, which renders it less persuasive[]" and the "opinion is an overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning."  (Tr. 105-106).  The ALJ did not, however, appear to rely on Dr. Kataria's critique in addressing Dr. Brandenburg's opinions.

allegations (Tr. 23) and found that the medical evidence did not support a finding of "disabling limitations" (*id.*).  He observed that Plaintiff never required inpatient treatment for these issues, imaging studies and laboratory tests did not reveal any abnormalities (Tr. 764, 765-66, 978-79), and Plaintiff's gastroenterologist attributed her complaints to pain medication (Tr. 983).  As such, the ALJ supported his conclusion that these issues do not give rise to disabling limitations.

> ### d.     Failure to include limitations determined by the state agency consultants.

Plaintiff asserts that despite affording the opinions controlling weight, the ALJ, without any explanation, failed to include certain limitations identified by the consultants in his RFC determination, including that she is moderately limited in the ability to understand, remember and carry out detailed instructions (Tr. 89-90); moderately limited in the ability to interact appropriately with the general public (Tr. 90); moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors (Tr. 90); and moderately limited in the ability to respond appropriately to changes in the work setting (Tr. 91).  (D.I. 11 at 16-17).  As discussed above, the Court agrees that the ALJ failed to account for the mental impairments established and will remand for further findings on this issue.

> ### 2.     Weight of Medical Opinions of Treating Physician

Plaintiff asserts that the ALJ erred in giving little weight to the opinion of Dr. Falco as to limitations based on Plaintiff's reduced concentration and frequency of absences.  The ALJ is charged with the duty of evaluating medical opinions.  *See* 20 C.F.R. § 404.1527.  "[T]he ALJ is free to accept some medical evidence and reject other evidence, provided that he provides an explanation for discrediting the rejected evidence."  *Zirnsak*, 777 F.3d at 614.  It is not for the Court to re-weigh the medical opinions in the record.  *See Gonzalez v. Astrue*, 537 F. Supp. 2d

644, 659 (D. Del. 2008). Rather, the Court must determine whether substantial evidence exists to support the ALJ's weighing of those opinions. *See id.*

"The law is clear [ ] that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Brown v. Astrue*, 649 F.3d 193, 197 (3d Cir. 2011). Generally, however, the opinions of a treating source will be given more weight. 20 C.F.R. § 404.1527(c)(2). To receive controlling weight a treating physician's opinion must be ". . . well supported by medically acceptable clinical and laboratory diagnostic techniques . . ." and must not be ". . . inconsistent with the other substantial evidence . . ." in the record. *See id.* § 404.1527(c)(2); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). Indeed, the ALJ is not required to accept treating source opinions uncritically and may decline to assign significant weight to such an opinion when assigning such weight would conflict with the record. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing 20 C.F.R. § 404.1527(c)(2)). Although "[a]n ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, [he] may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Id.* (citing *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985)).

Here, the ALJ noted that Dr. Falco had submitted "a medical source statement indicating the claimant needed to elevate her legs above heart level two and a half hours per day; rarely lift less than 10 pounds; never twist, stoop, bend, crouch, or squat; stand or walk less than two hours; sit four hours; shift positions at will; take unexpected breaks; be off task 25 percent of the workday; and be absent more than four days per month." (Tr. 24 (citing Ex. 18F)). He noted, however, that Dr. Falco's opinion was not supported by the totality of the evidence of record, and gave several examples. For instance, he noted that Dr. Falco's opinion that Plaintiff must elevate her legs above

heart level two and a half hours per day is not supported by the medical evidence, "as her treatment notes contained no recommendation of leg elevation." (Tr. 24). The ALJ also noted that Dr. Falco's statement that Plaintiff was restricted to lifting less than 10 pounds (and doing so rarely) was not consistent with treatment notes indicating that she maintained normal strength. (Tr. 24).[11] The ALJ noted that Dr. Falco's opinion that Plaintiff would be off task for 25% of the workday was not supported by his treatment notes, where he observed that Plaintiff could concentrate well and was not easily distracted. (Tr. 24).[12] And Dr. Falco's opinion that Plaintiff would be absent from work more than four days a month also lacked support in the record, such as repeated hospitalizations or notes regarding medically-necessary bedrest. (Tr. 24).

The ALJ's determination was not conclusory, but rather supported by evidence in the record. The Court finds that the ALJ's decision to afford less weight to Dr. Falco's decision was supported by substantial evidence.

## V.   **CONCLUSION**

For the reasons stated, the Court will grant in part and deny in part Plaintiff's motion, deny Defendant's cross-motion for summary judgment and remand for further proceedings. An appropriate Order will issue.

---

[11]   This conclusion is also supported by substantial evidence in the record. (Tr. 663, 678-79, 697-98, 829-30, 838-39, 854-55, 867, 872, 890).

[12]   This conclusion is also supported by substantial evidence in the record (Tr. 663, 678-79, 697-98, 829-30, 838-39, 854-55, 867, 872, 890).